J-S33016-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1405 EDA 2021 |

Appeal from the Order Entered June 24, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001087-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: C.I.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1406 EDA 2021 |

Appeal from the Order Entered June 24, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000150-2019

BEFORE:  BOWES, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED FEBRUARY 8, 2022**

E.R. (Father) appeals from the orders involuntarily terminating his parental rights to C.R. (Child), born in March 2017, and changing the

permanency goal to adoption.[1]  This matter returns to this panel after the trial court filed a supplemental Pa.R.A.P. 1925(a) opinion.  We affirm.

The trial court set forth the factual and procedural history of this appeal as follows:

> [DHS] first became aware of this family on March 30, 2017, when it received a General Protective Services (GPS) report concerning allegations that [Child] tested positive for cocaine and opiates at birth.  Mother admitted to using drugs throughout her pregnancy.  Mother also admitted using cocaine on March 29, 2017, which induced Mother to go into labor.  The GPS report also stated that [Child] exhibited symptoms of withdrawal.  The report was determined to be valid.
>
> After spending weeks in the [neonatal intensive care unit (NICU)], [Child] was discharged [from] Thomas Jefferson University Hospital (TJUH) on April 25, 2017.  That same day, DHS obtained an Order of Protective Custody (OPC) for [Child] and placed him in a foster home.  On April 21, 2017, [Child's] paternal grandfather contacted DHS, stated that he resided in Maryland, and was willing to care for [Child].

---

[1] Consistent with **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), Father filed separate notices of appeal at the dependency and termination of parental rights dockets.  This Court consolidated Father's appeals on July 26, 2021.

We note that the record in the dependency case refers to Child as C.I.R., while the record in the termination of parental rights case refers to Child as C.R.

Additionally, the trial court also terminated the parental rights of A.H. (Mother).  Mother has not appealed, nor has she participated in Father's appeals.  Although Father did not deny paternity of Child, the Philadelphia Department of Human Services (DHS) filed petitions to terminate the parental rights of any unknown fathers because Child's birth certificate did not list Father as Child's father.  No unknown fathers appeared at the hearing or appealed.

At the April 27, 2017 shelter care hearing, the OPC was lifted and the temporary commitment to DHS was ordered to stand. The [c]ourt ordered that Mother and Father be referred to the Clinical Evaluation Unit (CEU) for assessment, and one random drug and alcohol screen prior to the next court date. On April 28, 2017, Father submitted a urine drug screen, the results of which were positive for cocaine. Following the shelter care hearing, DHS filed a dependency petition for [Child] on May 1, 2017. On May 3, 2017, [Child] was decided dependent based on present inability and committed to DHS.

A Single Case Plan (SCP) meeting was held on May 24, 2017, at which time the permanency goal was reunification. The parental objectives for Father were to comply with all court orders; to comply with random drug screens and CEU assessment; to comply with Achieving Reunification Center (ARC) referrals; to comply with substance abuse treatment and recommendations; to participate in scheduled supervised visits with [Child]; and to comply with Probation Officer's recommendations. On April 30, 2018, Community Umbrella Agency (CUA) changed the primary permanency goal for [Child] to adoption.

At the permanency review hearing on December 5, 2018, the [c]ourt ordered that [Child] immediately be placed in kinship care with his paternal grand[father] in Maryland through an Interstate Compact on the Placement of Children (ICPC), where he has since remained. Paternal grand[father and step-grandmother] have identified themselves as pre-adoptive resources for [Child].

On March 4, 2019, DHS filed petitions to change the goal from reunification to adoption and to involuntarily terminate Father's parental rights. On June 12, 2019, DHS filed amended petitions revising [Child's] demographic information.

Following numerous continuances, a Goal Change Hearing (hereinafter the TPR hearing) was held before this Court on June 24, 2021.[2]

---

[2] We note that the TPR hearing considered the termination of Mother's and Father's parental rights concerning Child, the requested change of Child's goal to adoption, and a review of DHS's case concerning Mother and Father's child,
*(Footnote Continued Next Page)*

At the TPR hearing, the [c]ourt heard testimony from CUA Case Manager/Supervisor, Mr. Andrew Lemon, current CUA Case Manager, Mr. Nathan Kipp, [Mother], and [Father]. At the TPR hearing, Mr. Lemon testified that he has been the supervisor on this case since March 2020 and that he reviewed the entire case file as part of his supervisory duties. Mr. Lemon testified that [Child] came into care because he tested positive for cocaine and opiates at birth and was experiencing withdrawal symptoms. Mr. Lemon testified that Mother admitted to cocaine use. Mr. Lemon also testified that [Child] has remained in DHS care since an OPC was obtained for him on April 25, 2017.

Mr. Lemon further testified that Father's [SCP] objectives were as follows: (1) submit to random drug screens and CEU assessment, (2) drug and alcohol treatment, (3) ARC for appropriate services, (4) participate in visitation with [Child], (5) sign all consents and releases, and (6) comply with the terms of his probation as well as follow any recommendations from his Probation Officer.[fn2] In regard to Father's compliance with his SCP objectives, Mr. Lemon rated Father's compliance []as "minimal" for the year of 2018.

[fn2] The testimony was given regarding Mother's [SCP] objectives. Mr. Lemon testified that Mother and Father's SCP objectives, were essentially the same with the addition that Father comply with his probation.

---

A.R., born in 2019, during the continuances of the hearing. Mother, Father, and A.R. lived with paternal grandmother at the time of the hearing.

Additionally, Jo-Ann Braverman, Esq. represented Child as *guardian ad litem*, and Marilyn Rigmaiden-DeLeon, Esq. represented Child as child advocate. *See generally In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017).

According to the trial court, the more than two-year delay between DHS's filing of the petition and the TPR hearing resulted from the court's case load, the unavailability of witnesses, further investigation, motions, and continuance requests by counsel. Trial Ct. Op., 1/13/22, at 9. Additionally, the trial court noted that a new CUA case manager was assigned and that the COVID-19 pandemic led to suspended court proceedings. *Id.* The trial court's opinion did not expressly address Father's claim that DHS's petition to terminate his parental rights was "stale" due to the delay. *See id.*; *see also* N.T., 6/24/21, at 91-92.

With regard to CEU screens for Father, Mr. Lemon testified that prior to June 12, 2019—the date DHS filed Goal Change/TPR Petitions—Father submitted two drug screens, both of which were positive for cocaine. With regard to Father's drug and alcohol treatment, Mr. Lemon testified that Father did not successfully complete substance use treatment program prior to June 12, 2019. Mr. Lemon did testify that Father completed a drug and alcohol program in October 2020, after the Goal Change/TPR Petitions had been filed. Mr. Lemon further testified that Father's substance use and sobriety were the primary dependency concerns with respect to Father.

Regarding Father's ARC referrals, Mr. Lemon testified that Father did not successfully complete any parenting courses or other services at ARC prior to June 12, 2019. Mr. Lemon did testify that after the Goal Change/TPR Petitions were filed, Father completed financial education and housing through ARC and was provided certificates. Mr. Lemon testified that he did not have a certificate that Father ever completed parenting classes through ARC.

With regard to Father's compliance with the terms of his probation, Mr. Lemon testified that prior to June 12, 2019, there was a probation violation that resulted in Father being incarcerated. Father also testified that he was incarcerated for several months in 2019, but stated that he was currently compliant with probation.

When asked about Father's visitation with [Child], Mr. Lemon testified that prior to [Child] being placed with his paternal grand[father] in Maryland in December 2018, Father's visits with [Child] were to be supervised at the agency. After [Child] was placed with paternal grand[father], Father was to have one in-person visit with [Child] per month. Mr. Lemon also testified that Father's remaining visits throughout the month were virtual. Mr. Lemon testified that Father's visits with [Child] prior to June 12, 2019 were mostly consistent. Due to the COVID-19 pandemic, Mr. Lemon testified that that Father's in-person visits with [Child] were suspended and switched to virtual. Mr. Lemon also stated that Father's in-person visits with [Child] began again in September 2020. Mr. Lemon testified that since he obtained the case in March 2020, Father's visits with [Child] were consistent.

Mr. Lemon testified that [Child] does recognize Father but the relationship is not a caregiver-child relationship. Contrarily, [Child] is bonded with his paternal grand[father and step-

- 5 -

grandmother] who have been his primary caregivers for most of his life. He is doing well in the home. The current CUA Case Manager, Mr. Nathan Kipp, testified that [Child] is very bonded with paternal step-grandmother and respects her [as] a caregiver. [Child] looks to his [paternal grandfather and step-grandmother] for his basic needs as well as love, support, care, comfort, and stability. Mr. Lemon advised the [c]ourt that while [Child] was initially placed in a foster home, he was placed with his paternal grand[father] in December 2018 and has been living there since then. Mr. Lemon also testified that paternal grand[father's] home is a pre-adoptive home for [Child]. Mr. Lemon stated that if the [c]ourt were to involuntarily terminate Father's rights, there would be no irreparable harm to [Child]. Mr. Kipp[] testified that removing [Child] from paternal grand[father's] home where he has lived for most of his life would cause [Child] harm.

Trial Ct. Op., 1/13/22, at 1-6 (citations, some footnotes, and quotation marks omitted).

At the conclusion of the testimony concerning Child, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and changed Child's goal to adoption. That same day, the trial court entered the order terminating Father's parental rights to Child and an order changing Child's goal to adoption.

Father timely appealed the orders terminating his parental rights and changing Child's goal to adoption, and he submitted statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a Rule 1925(a) opinion citing to the June 24, 2021 hearing transcripts. Trial Ct. Op., 8/5/21, at 1-2. As noted above, the trial court complied with this Court's direction to file a supplemental Rule 1925(a) opinion.

Father raises the following issues in these consolidated appeals:

1. Whether the trial court committed reversible error when it involuntarily terminated [F]ather's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act, 23 Pa.[C.S.] § 2511(a)(1), (2), (5), (8).

2. Whether the trial court committed reversible error when it involuntarily terminated [F]ather's rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the child as required by the Adoption Act, 23 Pa.[C.S.] § 2511(b).

3. Whether the trial court committed reversible error when it changed the goal to adoption where such determination was not supported by clear and convincing evidence under the Juvenile Act, 42 Pa.[C.S.] § 6301 et seq.

Father's Brief at 6 (formatting altered).

## Termination of Parental Rights

Father's first two claims challenge the trial court's ruling that involuntarily terminated his parental rights. The following principles govern our review:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. [**In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010)]. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

- 7 -

As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

**In re Adoption of S.P.**, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted); **see also Interest of S.K.L.R.**, 256 A.3d 1108, 1123-24 (Pa. 2021) (emphasizing that "[w]hen a trial court makes a 'close call' in a fact-intensive case . . . the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court").

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" **Id.** (citation omitted).

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds

for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b) . . . .

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). This Court "may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a)." *In re M.T.*, 101 A.3d 1163, 1179 (Pa. Super. 2014) (*en banc*) (citation omitted).

### Section 2511(a)(8)

Father first claims that the 2019 petition to terminate his parental rights was "stale." Father's Brief at 19. Father emphasizes that DHS filed the instant petition to terminate his parental rights two years before the hearing and that he met his SCP objectives by the time of the hearing. *Id.* at 20. According to Father, fundamental fairness required consideration of his post-petition attempts to meet his SCP objectives and that DHS should have filed a new petition to terminate his parental rights before the June 24, 2021 hearing. *Id.* Father continues that the conditions that led to Child's removal no longer exist and asserts that he was compliant with his SCP objectives by the time of the hearing. *Id.* at 24. Father adds that the trial court should have considered the fact that DHS did not remove A.R., Mother and Father's other child, from his care. *Id.* at 20-21.

DHS responds that the trial court properly terminated Father's parental rights pursuant to Section 2511(a)(8). DHS notes that Father "does not make specific argument as to" subsection (a)(8), and instead relies on "conclusory

allegations" that the conditions that led to Child's removal no longer exist. DHS's Brief at 23. DHS adds that Father's testimony that he was ready for reunification contradicted his statements that he wanted "Child back only after he gets everything squared away." *Id.* (quoting N.T. at 74-76). DHS also notes that Child was in DHS's care for fifty months at the time of the hearing, Father was minimally compliant with the SCP before the filing of the petition, and Father only recently took steps to address his SCP objectives after the filing of the petition. *Id.* at 13. DHS concludes that Father's failures to perform parental duties and take timely steps to alleviate the conditions that led to Child's removal supports the trial court's decision to terminate Father's parental rights. *Id.*

Section 2511(a)(8) states:

> **(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> \* \* \*

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

Pursuant Section 2511(a)(8), once the trial court determines that the twelve-month period has run, it must next consider whether the conditions

that led to the child's removal continue to exist. ***In re A.R.***, 837 A.2d 560, 564 (Pa. Super. 2003). The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." ***In re I.J.***, 972 A.2d 5, 11 (Pa. Super. 2009). "Notably, termination under Section 2511(a)(8)[] does **not** require an evaluation of [a parent's] willingness or ability to remedy the conditions that led to placement of her children." ***In re Adoption of R.J.S.***, 901 A.2d 502, 511 (Pa. Super. 2006) (citations omitted) (emphasis in original).

A court may consider post-petition efforts if the efforts were initiated before and continued after the filing of a petition to terminate parental rights. ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010). However, a court may not consider efforts that a parent first initiated after the filing of the petition to terminate his parental rights. ***See id.***; ***see also*** 23 Pa.C.S. § 2511(b).

Section 2511(a)(8) also requires a court to assess the needs and welfare of the relevant child or children. The needs and welfare analysis "under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent" and must be addressed separately before considering the best interests of a child. ***See In re C.L.G.***, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (*en banc*).

This Court has stated:

[T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. . . . However, by allowing

- 11 -

for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen (18) months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care

*R.J.S.*, 901 A.2d at 513.

Instantly, the trial court explained its decision to terminate Father's parental rights as follows:

[Child] was born on March 30, 2017 and has been in care since April 25, 2017. He has been residing with paternal grand[father] since December 2018. The conditions that led to [Child's] removal were because [Child] tested positive for cocaine and opiates at birth. Prior to the filing of the petition to terminate Father's parental rights, Father submitted two drug screens which were positive for cocaine, and did not successfully complete any substance abuse treatment program. Prior to the filing of the TPR petition, Father also did not successfully complete any ARC services. Father has been consistent with visits, which remain supervised. Father was also incarcerated for periods of time throughout the life of the case. Additionally, Father testified that he is not currently in a position to be reunified with [Child], but that reunification may be possible in the future. [Child] needs permanency now. Prior to June 12, 2019, Father failed to complete his [SCP] objectives to alleviate the need for placement. As a result, this Court believes that Father will not remedy the conditions that led to [Child's] placement in a reasonable time. [Child] needs permanency now. Moreover, the evidence clearly established that termination would best serve the needs and welfare of [Child]. He has been residing in paternal grand[father's] home since December 2018, is well-adjusted, and has a strong bond with his paternal grand[father and step-grandmother].

Trial Ct. Op., 1/13/22, at 13-14.

The record supports the trial court's findings that termination was proper under Section 2511(a)(8). DHS presented evidence, and Father does not dispute, that DHS filed the June 12, 2019 petition to terminate Father's parental rights more than twelve months after DHS removed and placed Child in April 2017. Further, it is undisputed that Father did not comply with his SCP objectives **before** DHS filed the petition to terminate his parental rights on June 12, 2019.

Father instead emphasizes that more than two years passed between the filing of the petition to terminate Father's parental rights on June 12, 2019, and the hearing on June 24, 2021. Father, through cross-examination of Mr. Lemon, established that **after** DHS filed the petition to terminate Father's parental rights, Father completed several or all of his SCP objectives. N.T. at 32-35. Those objectives included consistent visitation with Child, passing drug screens, and completing drug and alcohol treatment. *Id.* Father also worked at two different kitchens, and his shifts ranged from eight to ten hours, seven days a week. *Id.* at 72. Mr. Lemon testified that the primary concerns for Father were "substance use and sobriety," and, on cross-examination, Mr. Lemon stated that Father was compliant with his objectives concerning Child in the year before the June 24, 2021 hearing.[3] *Id.* at 19, 35.

_____

[3] In rebuttal, DHS presented Mr. Lemon's testimony that he received a report from Mother and Mother's therapist that Father relapsed. N.T. at 82. When
*(Footnote Continued Next Page)*

However, when Father's counsel asked why Father thought the trial court should allow him to "keep [his] parental rights," Father responded:

> Well, I've never wanted to give him up in the first place. I am his father at the end of the day. And I am grateful that my family is taking care of him. I do want [Child] back, so -- I mean, at this time psychologically, for [Child], he's better where he's at. I don't -- like [Mother] stated, I don't want to -- I don't want to rip him out of where he's at when he's doing well. It's not the best choice for him. But when I do get everything squared away and I'm settled in a home, you know, if that's something we can work out as a family I was told, you know, down the road, you know, that's a possibility. I want that. I don't -- I want my son.

*Id.* at 73-74. Father acknowledged that he and Child should be closer than they are. *Id.* at 71. Father explained that "[d]ue to the choices I've made, I only have limited time with [Child]." *Id.*

Further, on cross-examination, counsel for DHS asked whether Father was currently in a position to care for Child, and Father responded:

> At this time -- I mean, I'm not in my own place, and that was one of the – it was one of the goals that were set for me to get [Child], was to have stability, a stable home of my own, not [paternal grandmother's] home. You know what I mean? So -- at this point, he's been there most of his life, you know? I -- at this point, no, I don't -- it probably wouldn't be in [Child's] best interest. What's in my best interest is to have him now. But it's not about me. It's about [Child]. So at this point, no, it probably wouldn't be the best to be under [paternal grandmother's] roof. I want my own roof before I get [Child], or at least try to get him back.

---

asked to specify contents of the report, Mr. Lemon stated that "[Mother] had some concerns that Father may have relapsed," but that Mother provided no further information concerning the substance at issue or a time frame. *Id.* There is no indication that the trial court credited this report as competent evidence of Father having relapsed.

*Id.* at 75-76.

Based on the foregoing, we conclude that the record established that twelve months had passed between Child's removal and placement and the filing of the petition to terminate Father's parental rights. *See* 23 Pa.C.S. § 2511(a)(8); *A.R.*, 837 A.2d at 564. Next, the record established that the conditions that led to Child's removal still existed in the twelve months before DHS filed the petition. *See I.J.*, 972 A.2d at 11. Moreover, the trial court acted within its discretion not to consider Father's post-petition efforts initiated after the filing of the petition.[4] *See* 23 Pa.C.S. § 2511(b); *Z.P.*, 994 A.2d at 1121; Trial Ct. Op., 1/13/22, at 15.

Lastly, as to the needs and welfare of Child, the trial court was entitled to credit Father's own testimony, as well as the case managers' testimony, as evidence that Father had not achieved a parental bond with Child. *See C.L.G.*, 956 A.2d at 1008-09; N.T. at 75-76. Further, evidence supported the finding that paternal grandfather and step-grandmother provided for Child's needs and welfare. *See* N.T. at 19-21 & 32-33 (indicating that Mr. Lemon reviewed reports for case aides and testified that paternal grandfather and step-

---

[4] We acknowledge, as did the trial court, that Father had taken steps to meet his initial SCP objectives by the time of the hearing. To the extent the trial court considered Father's post-petition conduct, we note that the court also weighed Father's recent progress against Father's own testimony about the possibility of reunification "at some time in the future." *See I.J.*, 972 A.2d at 11; N.T. at 75-76, 96. The trial court's finding of fact in this regard also had support in the record and is binding on this Court. *See S.P.*, 47 A.3d at 826-27.

grandmother had Child for most of his life and were currently "operating in a parenting capacity"), 41 (indicating that Mr. Kipp discussed Child's bonds with step-grandmother and the appropriateness of paternal grandfather and step-grandmother's home for Child); *see also* N.T. at 75-76.

For these reasons, we conclude that the record supports the trial court's decision under Section 2511(a)(8) and that the decision was free of legal error. To the extent Father asserts that DHS's petition to terminate his parental rights was stale, we discern no legal error in the trial court's decision that Father's post-petition conduct, which he initiated after the filing of the petition, was not relevant. *See Z.P.*, 994 A.2d at 1121. Accordingly, we affirm the trial court's ruling that DHS proved the grounds to terminate Father's parental rights under Section 2511(a)(8). *See S.P.*, 47 A.3d at 826-27; *R.J.S.*, 901 A.2d at 513 (emphasizing that a "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future").

### Section 2511(b)

Next, Father contends that DHS's evidence concerning Child's best interests was insufficient. Father's Brief at 24-27. Father notes that Mr. Lemon did not personally observe Father's interactions with Child and that Mr. Kipp personally only observed limited interactions between Child and step-grandmother. *Id.* at 25-27. Father argues that the trial court could not assess the effects of terminating his parental rights "[w]ithout any firsthand

testimony regarding [F]ather's bond with [C]hild or [C]hild's bond with paternal grandfather and step-grandmother]." *Id.* at 27.

DHS counters that the trial court properly considered the Child's best interests under Section 2511(b). DHS notes Mr. Lemon's and Mr. Kipp's testimony concerning Child's bond to paternal grandfather and step-grandmother and their beliefs that Child's removal from paternal grandfather and step-grandmother would be harmful. DHS's Brief at 26-27. DHS emphasizes that Father acknowledged that paternal grandfather and step-grandmother were meeting Child's needs and that Child's removal from their care would not be in Child's best interest. *Id.* DHS asserts that Father acknowledged that he was not in a position to assume responsibility for Child even at the time of the hearing. *Id.* at 19-20, 26.

Section 2511(b) states:

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

The mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, as "[e]ven the

most abused of children will often harbor some positive emotion towards the abusive parent." ***Id.*** at 267 (citation omitted). The trial court may emphasize the safety needs of the child. ***In re K.Z.S.***, 946 A.2d 753, 763 (Pa. Super. 2008) (affirming involuntary termination of parental rights, despite the existence of some bond, where placement with mother would be contrary to the child's best interests); ***see also In re Adoption of J.N.M.***, 177 A.3d 937, 946 (Pa. Super. 2018) (citation omitted) (reiterating that the detrimental effects of severing a parent-child bond could be outweighed by the need for safety and security). As this Court has noted, "a parent's basic constitutional right to the custody and rearing of . . . [his] child is converted, upon the failure to fulfill . . . [his] parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).

Instantly, there was uncontradicted evidence of a bond between Father and Child. ***See*** Trial Ct. Op., 1/13/22, at 5; N.T. at 19-21. However, as noted by the trial court, the record establishes that Child had been removed from Father's care shortly after Child's birth. ***See*** Trial Ct. Op., 1/13/22, at 1-2; N.T. at 11-13. Child was living with paternal grandfather and step-grandmother since 2018, and DHS filed the petition to terminate Father's parental rights in 2019. ***See*** Trial Ct. Op., 1/13/22, at 15; N.T. at 16. The trial court accepted testimony that Father appeared to be more of a visitation resource for Child and that Child did not have a caregiver-child relationship

with Father. *See* Trial Ct. Op., 1/13/22, at 15. The trial court emphasized Father's failure to progress beyond supervised visitation with Child and noted his testimony that it was in Child's best interests to remain with paternal grandfather and step-grandmother's home.[5] *See* Trial Ct. Op., 1/13/22, at 16; N.T. at 75-76. The trial court also considered Father's testimony about "possible reunification at some point in time in the future" but concluded that Child "needs permanency now." *See* Trial Ct. Op., 1/13/22, at 16; N.T. at 73-74.

Based on the foregoing record, we find no abuse of discretion or error of law in the trial court's determinations under Section 2511(b). The trial court was entitled to consider that Child was in DHS's care since his birth in 2017. The trial court further heard testimony that Father did not progress with his SCP objectives prior to the filing of the petition to terminate in 2019. Although the trial court acknowledged Father's post-petition compliance with his SCP objectives, the trial court noted, and the record supports, Father's agreement that Child's best interest was to remain with paternal grandfather and step-grandmother. Further, the trial court weighed Father's testimony that he hoped to be in a position to care for Child in the future against Child's

---

[5] Although not referred to by the trial court, we note that on cross-examination by Child's advocate, Father testified that Child did not express an interest in going home with Father. N.T. at 79. Father explained that Child never knew about being with "dad in a home" because DHS removed Child before Child went home. *Id.* Additionally, in closing arguments, Child's advocate asserted that Child wished to live with paternal grandfather and step-grandmother and that Child did not respond when the advocate asked if Child wanted to "go live with [Father.]" N.T. at 86.

need for permanency. We find no abuse of discretion or error of law in the trial court's emphasis on Child's need for permanency after Child was in DHS's care for approximately four years. *See R.J.S.*, 901 A.2d at 507 (noting that "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting" (citation and footnote omitted)). For these reasons, our review of the record, the parties' arguments, and the trial court's rulings compels the conclusion there was support for the trial court decision to terminate Father's parental rights under Section 2511(b).

In sum, we have reviewed Father's arguments concerning the termination of his parental rights, the trial court's findings and conclusions pursuant to Section 2511(a)(8) and (b), and the record. Following our review, we affirm the order terminating Father's parental rights. *See S.P.*, 47 A.3d at 826-27.

## Goal Change

In his third issue, Father contends that the trial court erred in changing Child's permanency goal to adoption. Father's Brief at 21. Father reiterates that the trial court should have considered his compliance with the SCP plan after DHS filed the petition to terminate his parental rights and change Child's permanency goal to adoption. *Id.*

At the outset, we note that Father's challenge to the goal change is moot based on our decision to affirm the order terminating Father's parental rights under Section 2511(a)(8) and (b). *See Interest of A.M.*, 256 A.3d 1263,

1272-73 (Pa. Super. 2021). In any event, for the reasons stated herein concerning the Child's best interests, we discern no abuse of discretion or error of law in the trial court's determination that a goal change to adoption was in Child's best interests. **See** 42 Pa.C.S. § 6351 (requiring the trial court to consider: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months); **In re R.M.G.**, 997 A.2d 339, 345, 347 (Pa. Super. 2010) (noting that "goal change decisions are subject to an abuse of discretion standard of review" and that a child's safety, permanency, and well-being take precedence over all other considerations in a goal change decision (citation omitted)).

Therefore, even if we were to consider Father's challenge to order changing Child's goal to adoption, we conclude that the trial court considered all relevant factors for a goal change to adoption, and this Court will not disturb the trial court's determination that Child's need for permanency outweighed Father's hopes to reunify with Child in the future. **See R.M.G.**, 997 A.2d at 347. For these reasons, we affirm the trial court's orders.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/8/2022